# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SHERNA S. R.,

   **Plaintiff,**

    **v.**

**ANDREW SAUL, *Commissioner, Social Security Administration*,**[1]

   **Defendant.**

**CIVIL ACTION FILE**

**No. 1:18-cv-05893-AJB**

## ORDER AND OPINION[2]

Plaintiff Sherna S. R. brought this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for Social Security disability insurance benefits ("DIB")

---

[1]    On June 17, 2019, Andrew Saul was sworn in as the Commissioner of Social Security. Under the Federal Rules of Civil Procedure, Saul "is automatically substituted as a party." Fed. R. Civ. P. 25(d). The Clerk is hereby **DIRECTED** to amend the case style to reflect the substitution.

[2]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (*See* Dkt. Entry dated Dec. 27, 2018). Therefore, this Order constitutes a final Order of the Court.

under the Social Security Act.[3]   For the reasons set forth below, the Court **REVERSES** the final decision of the Commissioner **AND REMANDS** the case to the Commissioner for further proceedings consistent with this opinion.

## I.   **PROCEDURAL HISTORY**

Plaintiff filed an application for DIB on October 13, 2015, alleging disability commencing on January 1, 2011.[4]  [Record (hereinafter "R") 168-71]. Plaintiff's application was denied initially and on reconsideration.   [R99-103, R105-110].   Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").   [R111-12].   An evidentiary hearing was held on October 19,

---

[3]    Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for Supplemental Security Income ("SSI") for the disabled.  Title II of the Social Security Act provides for DIB.  42 U.S.C. § 401, *et seq.*  SSI claims are not tied to the attainment of a particular period of insurance eligibility.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).   The relevant law and regulations governing the determination of disability under a DIB claim are identical to those governing the determination under an SSI claim.  *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985).  Title 42 U.S.C. § 1383(c)(3) renders the judicial provisions of 42 U.S.C. § 405(g) fully applicable to claims for SSI.  In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "Period of Disability," or to recover SSI. However, different statutes and regulations apply to each type of claim. Many times, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations herein should be considered to refer to the appropriate parallel provision as context dictates.  The same applies to citations of statutes or regulations found in quoted court decisions.

[4]    Plaintiff subsequently amended her alleged onset date to September 17, 2015.  [R32].

2

2017. [R27-65]. The ALJ issued a decision on January 24, 2018, denying Plaintiff's application on the ground that she had not been under a "disability" at any time through the date of the decision. [R12-26]. Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on October 29, 2018, making the ALJ's decision the final decision of the Commissioner. [R1-6].

Plaintiff then filed an action in this Court on December 27, 2018, seeking reversal of the Commissioner's decision. [Doc. 1]. The answer and transcript were filed on May 3, 2019. [Docs. 7-8]. On June 10, 2019, Plaintiff filed a brief in support of her petition for reversal of the Commissioner's decision, [Doc. 9], on August 9, 2019, the Commissioner filed a response in support of the decision, [Doc. 13], and on August 18, 2019 Plaintiff filed a reply brief, [Doc. 14]. The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs, and it is accordingly ripe for review pursuant to 42 U.S.C. § 405(g).[5]

## II.    PLAINTIFF'S CONTENTIONS

As set forth in Plaintiff's brief, the issues to be decided are (1) whether

---

[5]    Neither party requested oral argument. (*See* Dkt.).

substantial evidence supports the ALJ's residual functional capacity ("RFC"), (2) whether substantial evidence supports the weight given to a non-treating agency physician's opinion, and (3) whether the testimony of the vocational expert ("VE") cannot stand because the RFC was not supported by substantial evidence. [Doc. 9 at 1].

## III.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *superseded by* Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704 (Dec. 4, 2000),[6] *on other grounds as stated in Washington v.*

---

[6]      Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process. *Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990), *superseded by statute on other grounds as stated in Colon v. Apfel*, 133 F. Supp. 2d 330, 338-39 (S.D.N.Y. 2001); *Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (Story, J.) (citing 20 C.F.R. § 402.35(b)(1)). Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations. *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *Minnesota v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

*Comm'r of Soc. Sec.*, 906 F.3d 1353, 1360-61 (11th Cir. 2018).  The claimant must prove at step one that he is not undertaking substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to

perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## IV.    SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Dyer*

7

*v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive

evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## V. STATEMENT OF FACTS[7]

### A. Background

Plaintiff was a younger individual on the alleged onset date, with at least a high school education, and past relevant work as a data entry clerk and data processor supervisor. [R20]. Plaintiff alleges disability due to rheumatoid arthritis, fibromyalgia, and venous insufficiency. [Doc. 9 at 3].

### B. Lay Testimony

At the hearing, the ALJ noted that Plaintiff had amended her onset date to September 17, 2015. [R32]. Plaintiff then testified as follows. She was 46 years old at the time of the hearing and finished two years of college. [R32-33]. She worked as an underwriting support specialist for Country Financial until

---

[7] In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal. [*See* Docs. 9, 13-14; *see also* Doc. 8 (Sched. Ord.) at 3 ("The issues before the Court are limited to the issues properly raised in the briefs.")]. Where a party's numbering conflicts with the page numbers assigned by the Court's electronic filing system, the Court's citations will utilize the page numbering assigned by the Court's electronic filing system.

December 2010. [R33]. She could not work because of rheumatoid arthritis, fibromyalgia, and issues with the veins in her legs that kept her from being able to sit or stand for long periods. [R34]. Her medications also made her drowsy. [R34-35].

Plaintiff took medications for her rheumatoid arthritis but they became less effective over time. [R35-36]. She was on a narcotic for pain during the relevant period (before December 31, 2015, her date last insured). [R37]. She could do errands for a maximum of 30 minutes before her pain became severe and she would go find a place to sit down. [R37-38]. Plaintiff did physical therapy twice a week in 2015, but her symptoms would come back by the end of the day. [R38-39].

On a typical day, she would see her children off to school, go to a doctor's appointment or physical therapy, take a rest, do light housework and try to prepare meals. [R39]. She cooked twice a week and also took the children to their afterschool activities. [*Id.*].

Her counsel argued that she took a number of different medications in 2015 and it was difficult for her to remember them all. [R40-41]. In response to her counsel's questions, Plaintiff testified that she worked as an accounting clerk for a premium financing company for six years. [R42-44]. She worked as an

insurance underwriting support from 2007 to 2010.  [R44-45].  In that position she sat most of the day and worked on a computer.  [R45].  From 1999 to 2006, she worked as a data processor and sat most of the day and worked on a computer.  [R45-46].  Finally, she worked as an information researcher from 1996 to 1999 and sat and worked on a computer most of the day.  [R47].  Plaintiff also worked as a remittance processing supervisor where she mainly sat, worked on a computer, and supervised around 18 or 19 people.  [R47-48].

Plaintiff testified that she had trouble walking and could only walk for 15 to 20 minutes at a time without needing a 10-minute break.  [R48-49].  Her medications made her drowsy, which affected her balance.  [R49].  In 2015, Plaintiff wore "slide" shoes that did not apply too much pressure on her feet to prevent them from hurting.  [R49-50].  Plaintiff could stand for 20 to 30 minutes and would then need to take five-to-ten-minute breaks.  [R50].  Plaintiff wore compression hose eight hours a day to relieve some of the pain and pressure in her legs.  [*Id.*].  She could sit for around an hour before her legs began to hurt and feel heavy and then she would need to stretch them for 10 to 15 minutes.  [R50-51].  Her vascular surgeon instructed her to relieve the swelling by elevating her feet using a recliner two to three times a day.  [R51-53].  It took about an hour for her to get relief.  [R52].  She could then do chores for about an hour or an

11

hour and a half. [*Id.*]. In 2015, Plaintiff slept five or six hours at night and took a two-hour nap during the day about three days a week. [R53-54].

Plaintiff had pain in her knees due to her rheumatoid arthritis and when she was bending or squatting it was hard for her to get back up. [R54]. She experienced stiffness when she went from sitting to standing and had difficulty climbing stairs. [R55]. She had trouble squatting, stooping, and bending and had trouble using her hands because her joints were stiff. [R56]. Plaintiff still drove in 2015 and could drive for 30 to 45 minutes. [R59]. Plaintiff still went to church. [R60].

## C.  Medical Records

The relevant medical evidence of record shows that on July 10, 2013, Plaintiff presented to Maria L. Fondal, M.D., of the Arthritis Research Treatment Center, for a follow-up for treatment of rheumatoid arthritis. [R296]. Plaintiff evidently was discharged from the practice that date. [*Id.*]. Dr. Fondal noted that Plaintiff was tender to palpitation of the anterior groin, but had good range or motion; she had full range of motion in internal and external rotation of her shoulders; normal flexion and extension of her bilateral elbows; no tenderness to palpitation of her bilateral wrists and hands, and no acute synovitis of her wrist, MCP, or PIP joints; normal spine curvature with no tenderness to palpitation of

her lumbar spine, normal gait without assistance; and no effusion, no palpitation to tenderness and full extension and flexion as to her bilateral knees. [*Id.*].

Dr. Fondal assessed Plaintiff with rheumatoid arthritis, discontinued her Enbrel,[8] and continued her on Methotrexate,[9] Folic Acid,[10] Diclofenac,[11] and Isoniazid.[12]

---

[8] Enbrel (etanercept) is a tumor necrosis factor (TNF) blocker. It works by decreasing TNF, a protein produced by the immune system to help the body fight infections. In people with autoimmune disorders, the immune system produces too much TNF and mistakenly attacks healthy cells. It is used to treat rheumatoid arthritis, psoriatic arthritis, or ankylosing spondylitis, and to prevent joint damage caused by these conditions. Enbrel, https://www.drugs.com/enbrel.html (last visited 04/05/20).

[9] Methotrexate interferes with the growth of certain cells of the body, especially cells that reproduce quickly, such as cancer cells, bone marrow cells, and skin cells. Methotrexate is used to treat certain types of cancer of the breast, skin, head and neck, or lung. It is also used to treat severe psoriasis and certain forms of rheumatoid arthritis. It is usually given after other medications have been tried without successful treatment of symptoms. Methotrexate, https://www.drugs.com/methotrexate.html (last visited 04/05/20).

[10] Folic acid is a B vitamin. It helps the body make healthy new cells. MedlinePlus, https://medlineplus.gov/folicacid.html (last visited 04/06/20).

[11] Diclofenac is a nonsteroidal anti-inflammatory drug (NSAID). This medicine works by reducing substances in the body that cause pain and inflammation. It is used to treat mild to moderate pain, or signs and symptoms of osteoarthritis or rheumatoid arthritis. Drugs.com, https://www.drugs.com/diclofenac.html (last visited 04/05/20).

[12] Isoniazid is an antibiotic that fights bacteria. Isoniazid is used to treat and to prevent tuberculosis (TB). A person may need to take other TB medicines in combination with isoniazid. Drugs.com, https://www.drugs.com/search.php?searchterm=isoniazid&a=1 (last visited 04/06/20). The Court notes that Dr. Fondal did not diagnose Plaintiff with TB.

On March 30, 2015, Geetha Jonnala, M.D., of Eastside Rheumatology & Internal Medicine, prescribed physical therapy for Plaintiff on a diagnosis of rheumatoid arthritis. [R402]. On April 7, 2015, Plaintiff saw physical therapist Coy Leverette III and reported to him that she had been travelling the past weekend, drove for 12 hours, and felt increased stiffness and pain throughout her body. [R413]. Leverette noted that Plaintiff tolerated her prescriptions well and prescribed a treatment plan of continued pain management and increased strength and flexibility. [*Id.*].

On August 3, 2015, Plaintiff again saw Dr. Jonnala, who noted that Plaintiff had tried and failed several medications, presented with pain in her hips and legs as well as her muscles and joints, and that her pain was severe and constant. [R344]. Dr. Jonnala noted that Plaintiff was sleeping better at night but had varicose veins in her legs and bruising in the back of her thighs. [*Id.*]. Plaintiff was diagnosed with depressive disorder, myalgia and myositis, pain in joints, and rheumatoid arthritis. [R345].

On August 31, 2015, Plaintiff saw Alan Levy, M.D., of Peachtree Vascular Specialists, and presented with a vascular surgery evaluation for pain, varicose

---

[*See* R296-97].

veins, and bruising on the back of both legs after sitting. [R469]. Plaintiff reported that her symptoms had been present for two years, were moderate in intensity, and worsened with daily activities. [*Id.*]. Dr. Levy noted no atrophy of limb muscles, tone normal without abnormal movements but spiders and reticular varicosities in both lower extremities. [R471]. He assessed Plaintiff with spider veins and venous insufficiency, stated she would need a venous duplex for reflux study, discussed proper elevation with her, and found that therapies of elevation and analgesics were indicated. [*Id.*].

On September 10, 2015, Plaintiff saw Dr. Jonnala and complained of pain and discomfort in her knees due to rheumatoid arthritis as well as pain in her hips and knees. [R405]. Plaintiff stated that she was limping the day before and that extra walking over the weekend increased the stiffness in her legs. [*Id.*]. Plaintiff claimed she had difficulty with stair negotiation, bending, squatting, walking or standing for long periods, morning stiffness, and waking up at night. [*Id.*]. However, Dr. Jonnala found that Plaintiff had an unremarkable gait and good balance. [*Id.*]. Dr. Jonnala recommended Plaintiff continue physical therapy, increase strength and stabilization of her knee, and placed an emphasis on pain management. [*Id.*].

On September 17, 2015, Plaintiff again saw Dr. Levy's office and

complained of heaviness, fatigue, pain and painful varicose veins in her bilateral lower extremities over the last two years. [R473-75]. The impression was no evidence of deep vein thrombosis in the bilateral lower extremity veins; normal iliac imaging with spontaneous flow; normal peripheral venous flow patterns and easily compressible veins at all levels interrogated; evidence of venous valvular insufficiency by reflux evaluation bilaterally; and evidence of greater saphenous vein reflux bilaterally. [R475].

On September 28, 2015, Plaintiff again saw Leverette, claiming she had tightness in her hips and bilateral lower extremities. [R427]. Leverette noted that Plaintiff was tolerating her prescriptions well and set up a plan to increase her flexibility, core strength, and stabilization. [*Id.*].

That same date, Plaintiff followed-up with Dr. Levy, complaining of moderate pain over the last year as well as heaviness, fatigue, leg swelling, cramping, throbbing, and varicose veins bilaterally. [R512]. She stated that the pain had not gotten worse recently, prolonged standing or sitting did not make the pain worse, she raised her legs for relief, did not take medications for pain, was constantly on her feet at work, she had never worn support hose, and her symptoms did not interfere with her qualify of life. [*Id.*]. He noted her

medications as including Actemra,[13] Methotrexate, and Tramadol.[14] [R513]. He noted a full range of movement in all extremities, no gross joint abnormalities, swelling, or redness. [*Id.*]. Dr. Levy diagnosed Plaintiff with venous insufficiency and rheumatoid arthritis and recommended therapies of compression, elevation, and analgesics. [R514]. He also ordered compression socks and scheduled a six-month follow-up. [*Id.*].

On September 30, 2015, Plaintiff saw Leverette and complained of pain from her hips down to her feet. [R427]. Leverette assessed Plaintiff as tolerating her prescriptions well and found she had moderate pain in the pelvic crest and in her lower extremities with moderate pressure. [R428]. Leverette's recommended treatment plan was continued pain management, to increase flexibility and range of movement, and to strengthen Plaintiff's core and increase muscular endurance.

---

[13]    Actemra (Tocilizumab) is in a class of drugs called biologics. Tocilizumab is a treatment for adults with moderate to severe rheumatoid arthritis (RA), giant cell arteritis, and polyarticular and systemic juvenile idiopathic arthritis. A patient must have tried and failed another medication for RA before starting tocilizumab. Tocilizumab blocks a substance called IL-6, known to cause inflammation. People with RA often have too much IL-6. Johns Hopkins Arthritis Center, https://www.hopkinsarthritis.org/patient-corner/drug-information/tocilizumab-actemra/ (last visited 04/05/20).

[14]    Tramadol is a narcotic-like pain reliever and is used to treat moderate to severe pain in adults. Tramadol, https://www.drugs.com/tramadol.html (last visited 04/05/20).

[*Id.*].

On October 12, 2015, Plaintiff saw Leverette and stated that she felt pain throughout her body over the weekend, was hypersensitive to light touch, and felt weak. [R429]. Leverette assessed Plaintiff has tolerating her prescriptions well, having mild pain and tenderness in the lumbar/pelvic region, and as showing mild improvement with muscular extensibility. [R430]. Leverette's treatment plan for Plaintiff included continuing pain management, increasing flexibility, increasing core stabilization, and increasing muscular endurance. [*Id.*].

On October 14, 2015, Plaintiff again saw Leverette and stated that was feeling pretty good and had mild pain in her sacrum/coccyx. [*Id.*]. Leverette assessed Plaintiff as tolerating her prescriptions well and noted decreased sacral mobility with flexion/extension movements. [*Id.*]. The treatment plan included continued pain management, increased flexibility and range of movement, and increased core strength, stabilization, and endurance. [*Id.*].

On October 15, 2015, Plaintiff saw Indira Asser, M.D., of Rockdale Family Practice, indicating a history of headaches. [R376]. She was described as well appearing, well nourished, with a normal gait and station, no misalignment, defects, tenderness, decreased range of motion, instability, atrophy or abnormal strength in the head, neck, or extremities. [R377]. Plaintiff's deep tendon

reflexes were normal in her upper and lower extremities and she had no pathologic reflexes. [*Id.*]. Plaintiff was advised to limit acute treatments to 2-3 days/week to avoid medication overuse headache, to keep a headache diary in which symptoms, treatment and response to therapy are recorded, as well as any identified triggers; to avoid headache triggers, sleep adequate amount, avoid skipping meals, avoid emotional stress when possible, practice simple relaxation techniques and relaxation through yoga, and encouraged to get regular exercise. [*Id.*].

On October 26, 2015, Plaintiff saw Leverette and stated that she felt tightness in her lower extremities after missing her appointment the week before. [R430]. Leverette noted that Plaintiff was tolerating her prescriptions well but made no new observations. [R431]. The treatment plan included continued pain management, increased flexibility and range of movement, and increased core strength, stabilization, and endurance. [*Id.*].[15]

---

[15]   Leverette made roughly similar assessments and laid out roughly similar treatment plans on November 18, 2015, [R431-32], December 3, 2015, [R432-33], December 8, 2015, [R433], December 10, 2015, [R433-34], December 14, 2015, [R434], December 29, 2015, [R435], and December 31, 2015, [*id.*].

On November 3, 2015, Plaintiff follow-upped with Dr. Jonnala. [R341-43]. Dr. Jonnala noted that Plaintiff had tried and failed with different medications and was presenting with pain in her hips, legs and muscles and joints. [R341]. Plaintiff described the pain as severe and constant, stated she had joint swelling and stiffness in her joints for a few minutes in the morning, felt depressed at times, but was sleeping better at night. [*Id.*]. Plaintiff stated that she wore compression stockings at night. [*Id.*]. Dr. Jonnala noted her major problems to be rheumatoid arthritis, high cholesterol, and fibromyalgia. [*Id.*]. She noted that Plaintiff has varicose veins in her legs and fibromyalgia tender points. [R342].

On December 12, 2015, state agency reviewer Ronald Rosen, M.D., drafted a Residual Functional Capacity Assessment ("RFC") indicating that Plaintiff was limited to occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying 10 pounds, sitting or standing or walking for a total of six hours in an eight-hour workday, climbing ramps/stair frequently, climbing ladders/ropes/scaffolds occasionally, and needed to avoid concentrated exposure to extreme cold, wetness, and hazards. [R75-77]. The evidence of record portion of the evaluation indicates that Dr. Rosen examined material from Devon

Denton,[16] Plaintiff, and East Side Rheumatology & Internal Medicine. [R71-72]. Medically determinable impairments included inflammatory arthritis, fibromyalgia, and affective disorders. [R73-74].

On January 6, 2016, Plaintiff saw Leverette and stated that she had participated in increased activities over the weekend and was not feeling well because of increased pain in her hips, knees, and lower back. [R436]. Leverette noted that Plaintiff was tolerating her prescriptions well, had a moderate tightness in her buttocks with moderate pressure, and set out a treatment plan to continue pain management, increase flexibility, and increase core strength and stabilization. [*Id.*].

On March 30, 2016, state agency consultant B. Cochran, M.D., crafted an RFC with limitations similar to those found by Dr. Rosen. [R88-91]. Dr. Cochran additionally limited Plaintiff to only frequent stooping, kneeling, crouching, and crawling and found no limitations related to wet working conditions. [R89-90]. Dr. Cochran noted that Plaintiff was receiving treatment for varicose veins/venous insufficiency without stasis or cellulitis. [R90]. He noted that her joints did not show active inflammation or deformity and

_____

[16]    On December 1, 2015, Ms. Denton, Plaintiff's neighbor/friend, submitted a third-party function report. [R210-17].

concluded that she had venous insufficiency, rheumatoid arthritis, and fibromyalgia, but that her impairments did not meet or equal a listing singly or in combination. [R90]. Dr. Cochran's listed evidence of record indicated that he reviewed documents from Peachtree Vascular Specialists. [R83, 86].

### D. Vocational-Expert Testimony

The VE classified Plaintiff's past relevant work as data entry clerk and data processor/supervisor. [R60-61]. Asked to assume an individual of Plaintiff's age, education, and work experience who was able to perform light work with no climbing ropes, ladders or scaffolds, occasional climbing ramps and stairs, occasional crawling, frequent balancing, stooping, kneeling, and crouching, only occasional operation of foot controls bilaterally, only frequent exposure to extreme temperatures and to work place hazards, and who needed a sit/stand option at one-hour intervals, the VE testified that such a person could not perform her past work, but could find work in the national economy as a receptionist, booth cashier, and ticket seller. [R61-62]. The VE testified that if the individual would also need to take two one-hour breaks during the day in addition to normal breaks to elevate her legs the individual would not be able to perform her past work or work in the national economy. [R62-63].

## VI.  ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2015.

2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of September 17, 2015 through her date last insured of December 31, 2015 . . . .

3.  Through the date last insured, the claimant had the following severe impairments: rheumatoid arthritis; venous insufficiency; and fibromyalgia . . . .

    . . .

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 . . . .

    . . .

5.  After careful consideration of the entire record, [the ALJ found] that, through the date last insured, the claimant had the RFC to perform light work as defined in 20 CFR 404.1567(b) except: she cannot climb ladders, ropes or scaffolds; she can occasionally climb ramps and stairs and crawl; she can frequently balance, stoop, kneel and crouch; she can perform occasional operation of foot controls bilaterally; she is limited to no more than frequent exposure to extreme temperatures and to workplace hazards; she needs a sit/stand option at one-hour intervals.

    . . .

6.  Through the date last insured, the claimant was unable to perform any past relevant work . . . .

7.  The claimant was born on January 26, 1971 and was 44 years old, which is defined as a younger individual age 18-49, on the date last insured . . . .

8.  The claimant has at least a high school education and is able to communicate in English . . . .

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills . . . .

    . . .

10. Through the date last insured, considering the claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she claimant could have performed . . . .

    . . .

11. The claimant was not under a disability . . . at any time from September 17, 2015, the alleged onset date, through December 31, 2015, the date last insured . . . .

[R17-21].

The ALJ explained that Plaintiff was alleging a disability date beginning on September 17, 2015 and that her last date insured was December 31, 2015, but determined that Plaintiff was not under a disability during that period. [R15]. The ALJ found that Plaintiff's rheumatoid arthritis, venous insufficiency, and fibromyalgia were severe impairments that significantly limited Plaintiff's ability to perform basic activities. [R17]. In crafting Plaintiff's RFC, the ALJ stated that

24

she considered all the symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence. [R18]. The ALJ noted that Plaintiff alleged disability due to a combination of her impairments and that Plaintiff testified that she needed to recline her legs and that her bilateral lower extremity pain was most significant. [*Id.*]. The ALJ concluded that, although Plaintiff's symptoms could reasonably be expected to cause the alleged symptoms, her statements regarding the intensity, persistence and limited effects of those symptoms was not entirely consistent with the evidence in the case. [*Id.*].

The ALJ noted the narrow period of relevance in this case and concluded that the medical evidence did not support Plaintiff's claims. [R19]. The ALJ noted that, in April 2015, treatment records from Leverette indicated that Plaintiff traveled over the weekend and drove for 12 hours. [*Id.*]. The ALJ further noted that, in October 2015, Plaintiff received conservative treatment for headaches and at the time she had normal gait and station, no decreased range of motion, and no atrophy or abnormal strength or tone in her extremities. [*Id.*]. She also mentioned physical therapy notes indicating that Plaintiff was making continued progress toward the goals and recommendations of physical therapy and found that, despite Plaintiff's claims that her medications made her drowsy, contemporaneous reports did not reveal such complaints or even requests for

different medications. [*Id.*]. The ALJ noted that, in September 2015, Plaintiff reported that prolonged walking and sitting did not make her pain worse or interfere with her quality of life. [*Id.*]. The ALJ further observed that in November 2015, Plaintiff sought treatment for continued pain, joint swelling, and joint stiffness, and received medication adjustments that she stated helped to alleviate her pain. [*Id.*].

As for the opinion evidence, the ALJ gave significant weight to the opinion of Dr. Rosen, a non-examining state agency source, who determined that Plaintiff could perform at the light exertional level with the ability to occasionally climb ladders, ropes and scaffolds, and frequently climb ramps and stairs, and needed to avoid concentrated exposure to extreme cold, wetness, and workplace hazards. [R19-20]. The ALJ found that Dr. Rosen's assessment was consistent with the treatment records and examination findings. [R20].

The ALJ also gave significant weight to the findings of Dr. Cochran for reasons similar to the reasons given for Dr. Rosen. [*Id.*]. The ALJ noted that Dr. Cochran's evaluation was only three months after Dr. Rosen's, and assessed additional postural limitations, but his opinion was consistent with the treatment records and examination findings. [*Id.*]. Thus, the ALJ concluded that Plaintiff was not precluded from all work in the national economy, but Plaintiff was

unable to complete her past relevant work as a data entry clerk or data processor supervisor as it was generally performed. Relying on the VE's testimony, which was found to be consistent with the information contained in the Dictionary of Occupational Titles, the ALJ found that Plaintiff would be able to perform work that existed in significant numbers in the national economy, such as receptionist, booth cashier, and ticket seller. [R21]. The ALJ therefore found that a finding of "not disabled" was appropriate. [*Id.*].

## VII.  CLAIMS OF ERROR

Plaintiff argues that the RFC is not supported by substantial evidence because the ALJ did not list venous insufficiency in a review of Plaintiff's symptoms and made no accommodation for the leg elevation required by the vascular medical doctor for her venous insufficiency. [Doc. 9 at 6-7]. Plaintiff notes that the ALJ determined that the medical evidence did not support her contentions for the period in question but argues that the references cited are either irrelevant or incorrectly stated. [*Id.* at 7-8]. For example, Plaintiff argues that the ALJ cited to evidence showing a full range of motion but failed to discuss evidence of decreased blood circulation in her legs, [*id.* at 8 (citing [R465])]; and the ALJ's findings that the treatment records do not reveal complaints or requests for different medications, but the record is full of her medications being adjusted.

27

[*Id.* (citing [R299, 305, 306, 309, 312, 315, 320,4 324, 326, 327, 332, 335, 336, 341, 343, 345])].    Plaintiff argues that the ALJ asserted that there were no abnormal image findings, but her symptomatic venous disease was confirmed by ultrasound.  [*Id.* (citing [R464])].  Plaintiff argues that the ALJ ignored evidence for the relevant period, including medically required therapies of compression hose and leg elevation, and instead cited to irrelevant evidence.  [*Id.* at 8-9 (citing [R464])].

Next, Plaintiff argues that substantial evidence does not support the weight given to the non-treating-agency physician opinions of Drs. Rosen and Cochran because Dr. Rosen did not have the proper records to evaluate Plaintiff for venous insufficiency and Dr. Cochran evaluated them in his reconsideration review but did not add venous insufficiency as a medically determinable impairment, did not address leg therapy or compression stocking therapies, and gave an RFC identical to Dr. Rosen's.  [*Id.* at 10].  Plaintiff notes that the ALJ listed Peachtree Vascular evidence in a parenthetical reference to " 'compression, elevation and analgesics,' " [*Id.* at 10 & n.6 (citing [R463, 464, 471])], but argues that the ALJ's decision fails to resolve the issue.  [*Id.* at 10].  Plaintiff argues that no logical bridge has been built here between the evidence and result, which is necessary for meaningful judicial review.  [*Id.* at 11].

Finally, Plaintiff argues that, because the VE's testimony was based on a hypothetical that did not include a leg-elevation accommodation, the testimony regarding the jobs available that she could perform was flawed. [*Id.* at 11-12].

In response, the Commissioner argues that substantial evidence supports the RFC and that Plaintiff has failed to prove that she was disabled between her alleged onset date of September 17, 2015 and her date last insured, December 31, 2015. [Doc. 13 at 6-7]. The Commissioner argues that the fact that Plaintiff suffered from venous insufficiency is not at issue because the ALJ found that to be a medically determinable impairment. [*Id.* at 8]. He contends that Plaintiff's impairments, including venous insufficiency, did not preclude her from performing a range of light work. [*Id.*]. The Commissioner further contends that, although Plaintiff asserts that the ALJ did not account for the need to elevate her legs, the ALJ noted that testimony but found it to be inconsistent with the evidence, including her progress in physical therapy, normal examination findings, and statements made to Dr. Levy. [*Id.* at 8-9]. Accordingly, the Commissioner argues that the ALJ discounted, but did not ignore, Plaintiff's statements. [*Id.* at 9]. The Commissioner further argues that no medical opinion stated that she had to elevate her legs during the relevant period and that Dr. Levy suggested, at most, that she follow therapy consisting of elevation, compression, and

analgesics. [*Id.* at 10].

Next, the Commissioner contends that substantial evidence supports the weight given to the state agency medical consultant's opinions because they were consistent with treatment records and examination findings. [*Id.* at 10-12]. For example, the Commissioner notes that the ALJ considered supportive examinations from Peachtree Vascular Specialists from September, October, and December 2015. [*Id.* at 12-13]. The Commissioner argues that the ALJ reached her conclusion following an examination of the record and she was not prohibited from doing so because non-treating physicians also reached that conclusion. [*Id.* at 13].

Finally, the Commissioner argues that substantial evidence supports the ALJ's step-five finding that Plaintiff never proved that she required an accommodation or two additional one-hour breaks per day to elevate her legs. [*Id.* at 13-14]. The Commissioner argues that the ALJ was not required to include such a restriction because it was not supported by the record. [*Id.* at 13-14].

In reply, Plaintiff argues that medical records from October to November 2015 do not show progress and instead show ongoing bilateral lower extremity pain. [Doc. 14 at 2]. Plaintiff argues that Dr. Levy's treatment records are contradictory in that they state both that Plaintiff was not taking medication for

pain but also list pain medication. [*Id.* at 3]. Plaintiff also argues that, although Dr. Levy stated that sitting or standing did not make Plaintiff's pain worse, she complained of pain, heaviness, fatigue, and leg swelling and made those and similar complaints in the prior weeks. [*Id.* at 3-4]. Plaintiff admits that treatment records from Plaintiff's primary care physician in October 2015 indicate only a headache, but points to records from a vascular surgeon two weeks prior indicating bilateral leg pain. [*Id.* at 4]. She argues that the ALJ's claimed inconsistencies are "manufactured," and that the ALJ ignored relevant treatment notes and recommended treatments to craft an RFC that did not take the notes and treatments into account. [*Id.* at 5]. Plaintiff contends that the fact that the treating doctor did not opine regarding when or how long she needed to recline her legs is immaterial because the ALJ had a duty to investigate those facts. [*Id.*].

Second, Plaintiff argues that the Commissioner has not addressed her arguments that Dr. Rosen did not have any records of her venous insufficiency when forming his opinion and Dr. Cochran's opinion on reconsideration did not address it despite having records documenting a new diagnosis. [*Id.* at 6]. Plaintiff submits that the ALJ's reliance on these opinions was erroneous. [*Id.*]. Finally, Plaintiff asserts that, because the RFC was not supported by substantial evidence the testimony of the VE cannot stand. [*Id.* at 6-7].

After careful consideration of the parties' arguments, the ALJ's decision, and the evidence of record, the undersigned finds that the ALJ's decision was based upon errors of law and must be reversed and remanded. The Court notes that Dr. Levy, a treating physician at Peachtree Vascular Specialists whom Plaintiff saw repeatedly, assessed her with venous insufficiency, arranged for a reflex study, discussed proper elevation with Plaintiff, and found that therapies of elevation and analgesics were indicated. [*See, e.g.*, 462-64, R469-71, 512-14]. Plaintiff further testified that her vascular surgeon instructed her to elevate her feet two to three times a day, which she did for around a half an hour at a time. [R51-53]. The ALJ identified venous insufficiency as a severe impairment. [R17]. However, although the RFC crafted by the ALJ includes a sit-stand option at one-hour intervals, [R18], it does not require that Plaintiff be permitted to elevate her legs.

Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise.[17] *See Lewis*, 125 F.3d at 1440. " '[G]ood

---

[17]    Although Plaintiff does not assert that Dr. Levy was a treating physician, the Court finds that such was the case. [*See generally* Doc. 9]. A treating physician is one who provides a claimant with medical treatment or evaluation and also has an ongoing treatment relationship with the claimant. *Nyberg v. Comm'r of Soc. Sec.*, 179 Fed. Appx. 589, 591 (11th Cir. May 2, 2006). The record here indicates that Dr. Levy saw Plaintiff numerous times, [*see*

cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). Here, the Court notes some contradictory findings in Dr. Levy's opinions. For example, although Dr. Levy indicates that Plaintiff did not take medication for pain, he also lists Plaintiff as taking a pain medication, Tramadol, that is prescribed for pain relief. [*See* R513]; *see also* n.14 *supra*. Dr. Levy also recommended analgesics as a prescribed treatment. [R514]. Nevertheless, the Court notes that Dr. Levy consistently recommended elevation as treatment for Plaintiff's venous insufficiency.

In the present case, although the ALJ discussed the fact that Plaintiff testified that she needed to recline her legs and was unable to sit and stand for extended periods, [R18], the ALJ did not discuss the treatment notes from

---

R462-65, 469-71, 473, 512-14], and assessed, among other things, her venous insufficiency, which the ALJ found to be a severe impairment. [R17]. While the Social Security Regulations were changed to eliminate the treating physician rule, that change applies only to claims filed after March 27, 2017. *Robert W. v. Comm'r, Soc. Sec.*, No. 1:18-cv-0998, 2019 WL 3934803, at *8 (N.D. Ga. Aug. 20, 2019); 20 C.F.R. § 404.1520c. Plaintiff's claim was filed on October 15, 2015. [R168-71].

Peachtree Vascular and did not discuss the particular findings made by Dr. Levy. The Court is therefore unable to ascertain whether the ALJ considered them and, if so, how much weight was placed on them. See *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) ("[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor," such that the reviewing court may determine "whether the ultimate decision on the merits is rational and supported by substantial evidence" (citation omitted)).

The Court further concludes that any error was not harmless, as the VE testified that if Plaintiff needed to take two one-hour breaks during the day in addition to normal breaks to elevate her legs, she would not be able to perform her past work or other work in the national economy. [R62-63]. The Court also notes that, while it is true that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in h[er] decision," *Mitchell v. Comm'r, Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014), the ALJ's decision must still allow a reviewing court, "to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Id.*

The ALJ did, on the other hand, place great weight on the opinions of Drs. Cochran and Rosen, non-examining state agency sources. [R19-21].

However, as noted by Plaintiff, Dr. Rosen did not review the notes from Peachtree Vascular Specialists. [*See* Doc. 9 at 10; *see also* R71-72]. Dr. Cochran apparently did review such material, [*see* R83, 86], and did note that Plaintiff suffered from venous insufficiency, [R90], but did not impose any greater limitations than Dr. Rosen and provided no explanation for his decision not to do so. The Court, therefore, finds that Dr. Rosen and Dr. Cochran's opinions do not constitute substantial evidence and do not provide adequate reason for the ALJ's omission of Dr. Levy's diagnosis and recommended treatment.

The Commissioner's arguments to the contrary are not persuasive. The Commissioner argues that that fact that Plaintiff suffered from venous insufficiency is not at issue because the ALJ found that to be a medically determinable impairment, [Doc. 13 at 8], but, as described above, the issue in this case is whether limitations caused by the impairment are appropriate and not the existence of the impairment itself. The Commissioner further argues that Plaintiff's impairments would not prevent her from performing a range of light work, [Doc. 13 at 8], but the VE's testimony--that if Plaintiff needed to elevate her feet for length period during the day, she would not be able to secure employment--is to the contrary, [*see* R62-63]. The Commissioner argues that the ALJ noted the relevant testimony and her statements, but discounted them as

being inconsistent with the evidence, [Doc. 13 at 8-10], but, as explained above, the ALJ did not do so in a way that allows the Court to determine "whether the ultimate decision on the merits is rational and supported by substantial evidence," *see Winschel*, 631 F.3d at 1179.

Finally, the Commissioner argues that no medical opinion states that she needed to elevate her legs during the relevant period and that Dr. Levy only suggested that she follow certain therapies. [Doc. 13 at 10]. This argument is also unconvincing, however. Although Dr. Levy did not state with specificity, for example, how often Plaintiff would need to elevate her feet during a normal workday, that fact did not relieve the ALJ of addressing Dr. Levy's finding that elevation was a recommended treatment.

For these reasons, the Court concludes that the ALJ's decision was not supported by substantial evidence. Accordingly, this matter is **REVERSED AND REMANDED** to the Commissioner for further consideration of Plaintiff's claims consistent with this Order and Opinion.

Because the undersigned finds that the ALJ erred to reversal with respect to Plaintiff's first assignment of error, the Court has no reason to address his other assignment of error at any great length. *See Pendley v. Heckler*, 767 F.2d 1561, 1563 (11th Cir. 1985) ("Because the 'misuse of the expert's testimony alone

warrants reversal,' we do not consider the appellant's other claims."). However, because the issue has already been touched upon above, the Court agrees with Plaintiff's third assignment of error, which asserts that the VE's testimony was flawed because it was based on a hypothetical that did not include a leg-elevation accommodation. [*See* Doc. 9 at 11-12]. Upon remand and consideration of any need for Plaintiff to elevate her legs, the ALJ shall formulate a hypothetical consist with all of Plaintiff's limitations.

## VIII. <u>CONCLUSION</u>

In conclusion, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.

The Clerk is **DIRECTED** to enter final judgment in favor of Plaintiff.

**IT IS SO ORDERED and DIRECTED**, this 7th day of April, 2020.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE